VICTOR BALLARD,                          )
                         Plaintiff,      )
                                         )
             vs.                         )        Cause No. 2:10 cv 238
                                         )
SOLID PLATFORMS, INC.                    )
                         Defendant.      )

## OPINION AND ORDER

Plaintiff Victor Ballard, who is proceeding *pro se*, was employed as a carpenter by

Defendant Solid Platforms, Inc. but was laid off in November 2008. Ballard claims that Solid

Platforms failed to rehire him because of age discrimination, disability discrimination, and in

retaliation for filing a worker's compensation claim and an EEOC charge, in addition to

subjecting him to a hostile work environment. Solid Platforms requests summary judgment

claiming that the reason it did not rehire him is because he failed to contact the company to say

that he was looking for work, and so they were unaware of his interest in returning to work.

Ballard has offered no evidence that Solid Platform discriminated against him on the basis of his

age or disability, and no reasonable jury could find otherwise. Summary judgment will therefore

be granted.

## BACKGROUND

### Ballard's Age and Disability

Victor Ballard was 54 years old when he began his employment with Solid Platforms,

Inc. ("SPI") in September 2005 [DE 16 at 3; DE 16-2 at 3, 12]. Ballard worked as a carpenter

[DE 16-6 at ¶ 6]. Ballard has a military service-connected high frequency hearing loss that does

not impede his normal hearing function [DE 16-2 at 14]. Ballard informed SPI of his hearing problem when he first applied to work at the company [DE 16-2 at 4]. Ballard does not wear hearing aids, although he has been advised that he should do so by the Veterans' Administration [DE 16-2 at 14-16]. Ballard's hearing loss did not affect his daily life activities: for example, he has no difficulty going to the movies or watching television (either with closed captioning, the volume on high, or sitting near the television set) [DE 16-2 at 15-16]. Ballard's hearing loss did not affect his ability to perform his work for SPI, and did not significantly restrict him from performing a range of jobs for the company [DE 16-2 at 17]. Ballard described himself as an "exceptionally good performer," and he did not need any accommodation to perform his duties – he simply wore hearing protection while on the job [DE 16-2 at 16-17]. However, it was frustrating to Ballard and his co-workers when someone was trying to speak to Ballard and he could not hear the co-worker because he was wearing "excessive" hearing protection [DE 16-2 at 17].

### Ballard's Employment with SPI

During his time with SPI, Ballard was laid off for various client-demand-related reasons and recalled to work six times [DE 16-4 at 28; DE 16-6 at ¶¶ 8-10]. Ballard eventually began working on a project for SPI at the British Petroleum ("BP") refinery site in Whiting, Indiana [DE 16-2 at 12]. In 2008, when Ballard's complaints against SPI came to a head, there were over 2000 workers employed by various contractors at the BP refinery, and approximately 300 of those workers were employed by SPI [DE 16-6 at ¶¶ 4-5].

### General Horseplay by SPI Employees

Ballard had a co-worker at SPI named Matt Atterbury, who was in his late twenties or early thirties at the time of the events at issue [DE 16-2 at 9; DE 16-6 at ¶ 7]. If one believes Ballard (which I must at this stage of the proceedings), Atterbury behaved like a preschooler on the job site. At first, Ballard and Atterbury's relationship was pleasant, but eventually, Ballard felt that Atterbury was harassing him at the job site [DE 16-2 at 9]. According to Ballard, there were a variety of pranks, antics, and horseplay at the BP job site, perpetrated by SPI employees in general, and Atterbury in particular.

Here's what Ballard says went on: Atterbury would initiate water fights with Ballard and others, including at least one younger carpenter, who would respond in kind [DE 16-2 at 9; DE 16-3 at 20-22; DE 16-4 at 6]. Atterbury sprayed Ballard with a fire hose, and Ballard then sprayed him with a hose in retaliation [DE 16-3 at 6-7]. Atterbury threw snowballs at Ballard and other carpenters, and they responded by throwing them back at Atterbury [DE 16-3 at 7-8]. Atterbury put water on chairs in the break area, or in the back pocket of people's pants, so that when Ballard or others sat down in the chairs, it left a wet spot on their pants [DE 16-3 at 8; DE 16-4 at 6-7]. Ballard may have reciprocated against Atterbury for doing this [DE 16-4 at 6-7]. Twice, Ballard walked through a doorway and was splashed with water from a bucket that was rigged so that the person walking through the door would get wet [DE 16-3 at 16]. Ballard assumed that Atterbury was the culprit, but this was simply based on Ballard's observation that Atterbury laughed – he did not see him do it or have other information that would indicate that Atterbury was responsible [DE 16-3 at 16-17].

There were other acts of buffoonery at the work site, according to Ballard. For example, Ballard saw Atterbury balance a leg of a scaffold on his chin[DE 16-3 at 9]. This type of

3

foolishness scared Ballard; he was concerned that the leg could fall on him or other carpenters who were nearby [DE 16-3 at 9]. Atterbury and other carpenters would lift heavy objects to demonstrate how strong they were [DE 16-3 at 9-10]. Ballard heard that carpenters were wrestling with one another on the job site, but he did not see it or participate in it [DE 16-3 at 7]. Carpenters, including Ballard, arm wrestled one another [DE 16-3 at 23]. Atterbury would throw objects, balls, and playing cards for distance in break areas, which Ballard thought was dangerous because the objects could hit people [DE 16-3 at 18-19]. Both younger and older people were present in the break areas when this occurred, and Ballard did not know if anyone present had a disability [*Id.*]. Atterbury and other carpenters playing hacky ball, which involved kicking a round ball, and Ballard feared that other carpenters – of all ages – could have been hit or injured [DE 16-4 at 3]

There was more. Atterbury would drive vehicles or bicycles towards Ballard and others as if to hit them, and then swerve at the last minute to avoid hitting them [DE 16-3 at 10-11, 24]. Atterbury would also drive high lifts at excessive speeds while Ballard was in the basket part of the lift with Atterbury [DE 16-4 at 2]. Atterbury told Ballard that he used to play bumper cars with company vehicles, but Ballard never experienced this [DE 16-4 at 6].

The horseplay also included other general pranks. In the fall of 2005, someone pulled down Ballard's pants from behind while he was holding a lunchbox in his hands [DE 16-3 at 4]. Atterbury wired or duct taped Ballard's tools together so that he could not pull them apart, and Ballard responded in kind [DE 16-3 at 5-6]. Another younger carpenter, Ted Buhl, sprayed paint on Ballard's protective clothing when he was lying on a scaffold forty to fifty feet in the air [DE 16-3 at 6]. But Atterbury was an equal opportunity "jokester" because Ballard saw Atterbury do

the same thing to other carpenters, both younger and older [DE 16-3 at 22]. Ballard heard from someone else that someone was filling carpenters' hard hats with Jell-O, but that did not happen to Ballard, nor did he actually see it happen to anyone [DE 16-3 at 5]. Other horseplay included freezing hard hats in the common refrigerator, which Ballard heard happened to at least one other younger carpenter [DE 16-3 at 4-5]; fastening caution tape to the back of vehicles unbeknownst to the driver, causing the driver to drag the tape around the job site [DE 16-3 at 12]; letting the air out of bicycle tires (Ballard did not know specifically who this happened to) [DE 16-3 at 15]; taking carpenters' names off of the overtime list without the carpenters' knowledge [DE 16-3 at 21]; putting Visine eye drops in other carpenters' coffee, which did not happen to Ballard [DE 16-3 at 17]; hiding tools [DE 16-3 at 19-20]; and poking carpenters while they worked on scaffolds, which happened to a younger carpenter [DE 16-3 at 20].

Ballard heard that someone filled a hard hat with feces, but he couldn't recall who did it or who the victim was [DE 16-3 at 20]. During a break, Ballard once saw a foreman walk up to a sleeping carpenter, unzip his pants, put his private area near the sleeping man's face, and then wake the man up [DE 16-3 at 23-24].

**The "Rocking Chair" incident**

In approximately October 2005, Atterbury built a rocking chair and told Ballard that it was for him [DE 16-2 at 10]. Ballard assumed that the chair was to mock his age and implying that he had a back injury [DE 16-2 at 10; DE 16-3 at 14-15].

**Noise Pranks and Use of Air Horns**

Ballard objects to another category of horseplay involving radios and loud noises. Atterbury would program SPI radios so that carpenters could not communicate with others on

their crew [DE 16-4 at 4]. Ballard does not know if this happened to both older and younger carpenters [DE 16-4 at 4-5]. Atterbury would also turn up the radio to a very loud volume in company vehicles, subjecting whoever was in the vehicle with him – regardless of age or disability – to the loud noise [DE 16-4 at 5-6]. There were radios and DVDs played during safety meetings [DE 16-4 at 2, 6].

Ballard's chief complaint about the horseplay involves the use of air horns [DE 16-2 at 18-19; DE 16-3 at 13, 14, 17; DE 16-6 at 15]. Air horns were commonly available at the BP job site, because they were used to make warning signals for overhead cranes [DE 16-6 at ¶ 16]. Atterbury would rig up air horns in work vehicles so that when a passenger or driver got into the vehicle, the horn would blow [DE 16-3 at 11, 17] and set off air horns near other carpenters [DE 16-3 at 13]. Other carpenters may have also used the air horns [DE 16-3 at 14]. Atterbury did this to Ballard and at least one other carpenter, a Mr. Martinez, who Ballard estimated was under forty and did not have any disabilities to Ballard's knowledge [DE 16-2 at 5; DE 16-3 at 11, 21]. Other carpenters may have also used the air horns [DE 16-3 at 14].

In fact, Ballard was not aware if there was anyone else on his crew with a disability [DE 16-3 at 8, 18]. However, Ballard felt that there "seemed to be a preference out there to harass the older carpenters," at the hands of Matt Atterbury [DE 16-2 at 5]. According to Ballard, Atterbury's antics bothered everyone on the crew, including both younger and older carpenters [DE 16-2 at 5]. It is Ballard's "speculation" that the pranks were played on him because of his age and his disability [DE 16-2 at 6].

The last straw for Ballard occurred when the five members of his crew got into a company vehicle, and as the last person got in, an air horn went off inside the vehicle [DE 16-4

at 16; DE 16-6 at ¶ 11].

**Report of Horseplay**

On August 19, 2008, just after the air horn incident, Ballard went to James Oprisko, the construction safety representative for BP and complained about the "horseplay culture" at the plant [DE 16-4 at 16; DE 16-6 at ¶ 11]. Oprisko wrote to Jason Lammertin, SPI's president, and reported Ballard's allegations that "'mischievous' [sic] behavior" was occurring, and that someone "taped an air horn under the seat of one of the pick-up trucks which then sounds off when a passenger sits on the seat" [DE 16-6 at ¶ 11, 8]. Oprisko also wrote that he had "taken down the names" of those involved, but Ballard denies having provided Oprisko with Atterbury's name [DE 16-4 at 17; DE 16-5 at 21; DE 16-6 at 8].

Following Ballard's report to Oprisko and the email from Oprisko to Lammertin, Lammertin met with Ballard [DE 16-3 at 3; DE 16-6 at ¶ 12]. Job site supervisors and Ballard's union steward also attended the meeting. [DE 16-5 at 13; DE 16-6 at ¶ 12]. At the meeting, Lammertin asked Ballard to provide him with the names of the employees responsible for setting off the air horns, but Ballard declined [DE 16-4 at 15, 25-26; DE 16-5 at 21; DE 16-6 at ¶ 13]. Ballard attempted to describe a worker's compensation claim that he had filed against SPI, but Lammertin told Ballard that he did not want to discuss the worker's compensation claim [DE 16-3 at 3; DE 16-5 at 21].

Following the meeting, Lammertin conducted an investigation into the horseplay and air horn use, including interviewing the carpenters who were in the truck with Ballard when the air horn went off, but he was not able to identify the culprits [DE 16-6 at ¶ 14-15]. However, Lammertin went to the BP site in Whiting and informed all SPI employees that the horseplay

would not be tolerated [DE 16-6 at ¶ 17].

**SPI Policy on Reporting Harassment**

Prior to his report to Oprisko, Ballard had not reported his complaints to his supervisor, Larry Bertoch, or to any other SPI manager [DE 16-2 at 7-8].  Other than reporting the horseplay culture to Oprisko, Ballard did not make any complaints to his foreman, Bertoch, to Jason Lammertin, the President of SPI, or to Geoffrey Graegin, who was identified in SPI's harassment policy as the person to whom reports of harassment or discrimination were to be made [DE 16-4 at 17-18, 26; DE 16-5 at 16, DE 16-6 at ¶2].

SPI had a policy prohibiting employees from harassing, coercive, or disruptive behaviors, defining discriminatory conduct as "substantially interfer[ing] with an individual's employment or creat[ing] an intimidating, hostile, or offensive work environment" [DE 16-5 at 16].  The policy charged employees with "making known to any offender that his or her conduct is unwelcome or unwanted" [DE 16-5 at 16].  The policy also instructed employees to promptly report any violations of the policy to Graegin or Lammertin [DE 16-5 at 16].  Ballard acknowledged that the policy required him to go directly to Lammertin with complaints, but he did not do so because he was not aware of the policy, even though he signed statements acknowledging receipt of the policy [DE 16-4 at 26-27; DE 16-5 at 17, 18, 19, 20].  Ballard did not complain to anyone in SPI's management because he did not think that it would do any good [DE 16-2 at 8].

**Ballard's Transfer to the White Tent**

As a result of his complaints about the air horns, Ballard was removed from the building crew that he was on with Atterbury and placed in the "white tent," an area where supplies were

kept [DE 16-2 at 18; DE 16-3 at 2; DE 16-5 at 22; DE 16-6 at ¶ 18]. So Ballard was moved from his position as a scaffold builder, working 100-200 feet in the air, to a tent where he had to organize supplies. Ballard suspects that the move was made by SPI in order to find a place "closer to the door" and better suited to "somebody with a physical disability" [DE 16-3 at 2]. Ballard also contends that the move to the white tent was an act of retaliation for his complaints about the horseplay. Horseplay and the use of air horns were no longer a problem in the white tent, and Ballard received the same hours, salary, and benefits as he did when he was building scaffolds [DE 16-2 at 18-19; DE 16-3 at 4; DE 16-6 at ¶ 18].

Ballard's supervisor in the white tent was Michael Krecik [DE 16-7 at ¶ 2-3]. Krecik did not know about Ballard's worker's compensation claim, nor did he know about the filing of an EEOC charge (which did not occur until April 2009) [DE 16-4 at 19; DE 16-7 at ¶ 6]. Ballard never told Krecik about his high frequency hearing loss, and Krecik did not know that Ballard had any type of hearing problem [DE 16-4 at 19; DE 16-7 at ¶ 7].

**Ballard's Layoff from SPI and His EEOC Filing**

In November 2008, BP's demands changed, and SPI laid off employees as part of a reduction in force [DE 16-6 at ¶ 21]. Ballard and a number of other employees were laid off on November 14, 2008, including seven of the eleven employees who were working in the white tent at the time [DE 16-6 at ¶ 21; DE 16-7 at ¶¶ 8-9]. Krecik recommended Ballard for layoff because Ballard had the least amount of experience in the white tent as compared to his coworkers there [DE 16-6 at ¶ 20; DE 16-7 at ¶ 5]. Krecik recommended seven people for layoff at the same time as Ballard [DE 16-7 at ¶ 8]. Of those seven, five were under the age of forty [DE 16-7 at ¶ 8]. Krecik retained four employees in the white tent area, three of whom were

over forty and two of whom were over fifty [DE 16-7 at ¶ 9]. Krecik does not know if any individual he recommended for layoff was disabled [DE 16-7 at ¶ 10].

Ballard wrote a letter to Lammertin dated November 25, 2008, alleging that his November 14, 2008 layoff was in retaliation for his having reported the horseplay culture at the BP refinery to Oprisko [DE 16-5 at 12-15; DE 16-6 at ¶ 22]. In it, Ballard wrote that "your employees think it is fun to blare marine air horns...your employees have blared these marine horns for no reason but to have what they consider fun...I consider this behavior harassment and physically harmful" [DE 16-5 at 13]. Ballard also noted that the horseplay problem was well-known to SPI, the SPI field site superintendent at the BP refinery, the general foreman, the safety manager, and the union steward [DE 16-5 at 14]. Ballard's letter makes no reference to age or disability discrimination or harassment, or retaliation for filing a worker's compensation claim [DE 16-4 at 21; DE 16-6 at ¶ 23].

Ballard filed an EEOC charge against SPI on April 6, 2009 [DE 16-5 at 2; DE 16-6 at ¶ 26]. The EEOC issued a right to sue letter on March 16, 2010 [DE 16-5 at 8].

**SPI Rehires Employees in 2009**

Following the November 2008 layoff, SPI hired or rehired sixty employees over the age of forty, and twenty of those employees were over the age of fifty [DE 16-6 at § 34]. On April 7 and 10, 2009, SPI hired thirty employees, half of whom were over forty and seven of whom were over fifty [DE 16-6 at § 36].

**DISCUSSION**

Ballard has asserted an age discrimination claim, a disability discrimination claim, and hostile work environment and retaliation claims under both Title VII and the Americans with

Disabilities Act.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; *see Howard v. Lear Corp. EEDS and Interiors*, 234 F.3d 1002, 1004 (7th Cir. 2000); *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 458 (7th Cir. 1999). A genuine dispute about a material fact exists only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The party seeking summary judgment carries the initial burden of demonstrating an absence of evidence to support the position of the non-moving party. *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). The non-moving party must then set forth specific facts showing that there is a genuine issue of material fact and that the moving party is not entitled to a judgment as a matter of law. *Anderson v. Liberty Lobby*, 447 U.S. 242, 252 (1986). The non-moving party must support its contentions with admissible evidence and may not rest upon mere allegations in the pleadings or conclusory statements in affidavits. *Celotex*, 477 U.S. at 324. The plain language of Rule 56 mandates the entry of summary judgment against a party who fails to establish the existence of an element essential to its case and on which that party will bear the burden of proof at trial. The production of only a scintilla of evidence will not suffice to oppose a motion for summary judgment. *Anderson*, 477 U.S. at 252.

In examining the evidence, the Court must draw every reasonable inference from the record in the light most favorable to the non-moving party. *Haefling v. United Parcel Serv., Inc.*, 169 F.3d 494, 497 (7th Cir. 1999); *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1453 (7th Cir.

1994).  In undertaking this analysis, I am mindful that *pro se* pleadings are "to be liberally construed." *Erickson v. Pardus*, 127 S.Ct. 2197, 2200 (2007) (citation and quotation omitted); *Anderson v. Hardman*, 241 F.3d 544, 545 (7th Cir. 2001).

## I.    Procedural Issues

As an initial matter, although it's a tedious exercise, I must address Ballard's summary judgment submissions and his failure to comply with Federal Rule of Civil Procedure 56 and Local Rule 56.1.  There appear to be three main procedural issues with Ballard's opposition to SPI's motion for summary judgment.  First, Ballard seems to misunderstand the nature of summary judgment itself, and the requirement that the party opposing summary judgment come forward with affirmative evidence showing that there are issues in dispute that do, in fact, require a trial.  Second, Ballard has not provided admissible evidence for me to consider in the form of depositions, affidavits, declarations, or admissions.  Finally, while Ballard has made a number of assertions based on his own thoughts and beliefs about what SPI has done, he cannot create a genuine issue of fact by relying on statements that are not based on his personal knowledge.

Ballard filed a brief [DE 18], which included a "Statement of Genuine Disputes" [DE 18 at 1].  Ballard then included a "Designation of Evidence" in support of his brief, which included 11 exhibits [DE 18-1, Exhs. a-k].  Ballard also filed a sur-reply without leave of court, styled as Plaintiff's Reply in Opposition to Defendant's Motion for Summary Judgment [DE 20][1].

Summary judgment is the point in this litigation where Ballard must "present record

---

[1]This sur-reply is the subject of Defendant SPI's Motion to Strike Plaintiff's Sur-Reply [DE 21]. Because I am granting SPI's Motion for Summary Judgment, I will deny the Motion to Strike as moot.

evidence sufficient to create a genuine dispute of material fact" that SPI discriminated against him on the basis of his disability and age, created a hostile work environment, and failed to rehire him in retaliation for his worker's compensation and retaliation claims, which would require a trial in this matter. *Schacht v. Wisconsin Dep't. of Corrections,* 175 F.3d 497, 504 (7th Cir. 1999) (*overruled on other grounds by Higgins v. Mississippi*, 217 F.3d 951 (7th Cir. 2000)). Ballard appears to have misinterpreted what he must accomplish at this stage of the litigation, and instead asks me to deny the motion for summary judgment because he "believes without a doubt this case could be proven through witness testimony in a Court of law" [DE 18 at 19]. However, the time for providing the Court with witness testimony is now, at the summary judgment stage. *See Schacht*, 175 F.3d at 504. The very purpose of summary judgment is "to head off a trial . . . if the opponent . . . of summary judgment does not have a reasonable prospect of prevailing before a reasonable jury." *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989).

This brings us to the second problem with Ballard's summary judgment papers: to show that there are in fact genuine issues of material fact that would necessitate the trial that he requests, Ballard was required to present admissible record evidence in support of his assertions that there are genuine disputes of fact. Ballard's Statement of Genuine Disputes does not satisfy Federal Rule of Civil Procedure 56(c), which requires litigants asserting that a fact is genuinely disputed to "support the assertion by...citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

Instead of citing to portions of the record to support his assertions that there are genuine disputes of fact, Ballard makes blanket statements that he simply "disagrees" with various portions of SPI's summary judgment motion and supporting submissions, including "Defendant's interpretation of the claims and events that led to the filing of this case," "Defendant's Declaration(s) herein submitted as exhibits," and "the Defendant's interpretations of the enclosed portions of the Plaintiffs [sic] deposition" because SPI "excluded portions of the . . . deposition" that would have accurately portrayed what was said at the deposition [DE 18 at 1-2]. Ballard also disagrees generally with the Motion for Summary Judgment because it seeks to "be the Judge and Jury [sic] without any sworn witness testimony other than Defendants interpretation through their attorney and two witness declarations that the Plaintiff disagrees with" and because SPI's policies against harassment "are in writing only, and are not being enforced" [DE 18 at 2].        Throughout its reply brief, SPI noted that Ballard had failed to make any specific citations to the record, and noted that Ballard "generally" disagreed with portions of the Motion for Summary Judgment and supporting exhibits [DE 19]. Ballard responded in his sur-reply that he "does not 'generally' disagree with any statements the Defendant has made in their reply for summary judgment in this case, but rather 'strongly' disagrees with the Defendants [sic]" and suggests that it would be more accurate to replace all uses of the word "generally" in SPI's filing with the word "strongly" [DE 20 at 3]. Regardless of whether Ballard "strongly" disagrees or just "generally" disagrees with SPI, it is not sufficient for a party opposing summary judgment to make the types of blanket statements that Ballard has made. Rather, he is required to cite to particular portions of the record of admissible evidence to provide support for his list of genuine disputes. For example, rather than simply objecting to

14

SPI's inclusion of specific portions of his deposition as "misleading," [DE 18 at 2] and criticizing SPI for excluding portions that would "give . . . an accurate explanation of the testimony," Ballard could and should have cited to the other portions of his deposition that he claims support his assertions of genuine disputes, and provided those excerpts of the deposition to the Court. Unfortunately, Ballard has failed to provide any factual detail to support his statement of genuine issues; and his general disagreement with SPI's motion does not suffice.

Elsewhere in his opposition brief, Ballard argues that the white tent was "punishment duty," and the majority of other carpenters that Ballard worked with also considered the white tent to be a form of punishment, but cites to absolutely no deposition or affidavit of any SPI employee or other admissible record evidence on that point [DE 18 at 13]. Ballard argues that there are "hundreds of SPI employees that have witnessed this harassment and hostile work environment and dozen [sic] have witnessed the same environment while under the supervision of SPI supervisors Ron Bennett and Larry Bertoch" [DE 20 at 3]. But again, Ballard fails to cite to a shred of admissible evidence – such as the deposition or affidavit of a single other SPI employee – to support this statement. To establish that these facts are genuinely in dispute, Ballard would have needed to depose these witnesses or obtain affidavits from them. Ballard's bare contentions that other employees "understood" or "felt" a certain way are simply not admissible evidence that I can consider in assessing whether there are genuine factual disputes requiring a trial in this matter.

Although the majority of Ballard's opposition to the motion for summary judgment is devoid of citations to the record in this case, Ballard did make some attempts to provide citations to evidentiary materials that he provided in support of his opposition [*e.g.*, DE 18 at 12, 14].

And to be fair to Ballard, Rule 56 does allow him to cite to "documents...or other materials." However, Ballard submitted these exhibits without any kind of affidavit identifying the exhibits, explaining how, or in many cases, when, they were created, or attesting to their accuracy. Documents or letters submitted under Rule 56 must be accompanied by an affidavit that authenticates the document. *Article II Gun Shop, Inc. v. Gonzales*, 441 F.3d 492, 496 (7th Cir. 2006).

Ballard did include a "declaration" at the outset of his opposition to the motion for summary judgment, but the only thing it declares is that he is the plaintiff in this case [DE 18 at 1]. Ballard has failed to include an affidavit identifying the exhibits or otherwise providing any basis for their admissibility in evidence. Ballard did provide an index listing what the exhibits are [DE 18-1 at 1]. Exhibits a and b are the declarations of Michael Krecik [DE 18-1 at 3-4] and Jason Lammertin [DE 18-1 at 5-9] that were part of SPI's designated evidence supporting its summary judgment motion [DE 16-6; DE 16-7], but they appear to have been annotated by Ballard to reflect his objections to their contents. I say "appear" because Ballard does not provide information explaining exactly what the notations are or who made them (I presume that it was Ballard). For example, in response to paragraph 3 of Mr. Krecik's declaration, which states that Krecik supervised Ballard in the white tent area, Ballard appears to have noted "In title only/ self-supervised" [DE 18-1 at 3].

Exhibit c purports to be "charges filed against Atterbury," a document apparently created by Ballard on October 28, 2008 when he filed a grievance against Atterbury with their labor union, but the document is unsigned and the empty signature block is undated [DE 18-1 at 11].

Ballard identifies Exhibit d as a "list of horseplay activities" and Exhibit e as "notes

regarding threats while working for SPI at Bp, Whiting refinery," but does not provide information as to when the documents were prepared, who prepared them, or what the purpose was in preparing them, in addition to being somewhat confusing and difficult to understand [DE 18-1 at 12-19].

Exhibit f appears to be the email that Oprisko sent to a number of SPI employees, including Lammertin, following his discussion with Ballard about the horseplay at the BP site [DE 18-1 at 20]. This appears to be the same exhibit cited by SPI in support of its motion [DE 16-6 at 8].

Exhibit g purports to be a letter to Aaron Carlberg, the president of Ballard's union, dated October 28, 2008, but it is unsigned [DE 18-1 at 21-27]. Similarly, Exhibit h is a letter dated February 13, 2007, with a hand annotation indicating that it is actually from February 13, 2009, to David Tharp, an officer in Ballard's labor union [DE 18-1 at 28-31]. The letter is not signed [DE 18-1 at 31].

Exhibit i is Ballard's November 25, 2008 letter to Lammertin, which also appears to be the same exhibit cited by SPI in support of its motion [DE 16-6 at 10-13], and Exhibit j is Lammertin's December 3, 2008 response [DE 18-1 at 36-37], also provided by SPI in support of its motion [DE 16-6 at 15-16]. Finally, Ballard's Exhibit k purports to be Ballard's response to Lammertin's December 2008 letter [DE 18-1 at 38-41]. But it doesn't resemble a letter, and there is no indication why it was prepared, who prepared it (although it was presumably Ballard), when it was prepared, whether it is accurate, or even that this was a letter sent to SPI. *Id.*

Although Ballard is proceeding *pro se*, he must nonetheless follow the rules of procedure. *Pearl Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008). Otherwise, *pro se*

litigants would be at a distinct advantage. Frankly, Ballard's exhibits are almost entirely inadmissible because they are lacking the very information that an affidavit, as required under the rules, would have provided: information about what they are, why they have been provided, and why they are reliable. Without this most basic information, I am unable to consider these exhibits (other than those properly identified through declaration by SPI) in support of Ballard's opposition to SPI's motion.

Finally, even if I were to construe Ballard's statements in his briefs as being under oath, or as some sort of affidavit or sworn statement that would satisfy the requirements of Rule 56(c), Ballard cannot rely upon his own statements because they are not based on his personal knowledge, and they are utter speculation. Ballard's conjecture, thoughts, or feelings are simply not enough to establish a genuine issue of material fact. *Palucki*, 879 F.2d at 1572.

For example, although Krecik executed a declaration denying that he had any knowledge that Ballard had a hearing problem [DE 16-7 at ¶ 7], Ballard "believes it is reasonable" that SPI would have informed Krecik of his hearing problem [DE 18 at 4]. Later in his opposition, Ballard claims that he "believed, and continues to believe," that Atterbury made comments about Ballard having a bad hip "because of the Plaintiff's age, which constituted age discrimination" [DE 18 at 6]. Ballard also argues that he "understood and still believes the only just way workers should be sent out on jobs is to go out based on the union 'out of work' list" [DE 18 at 7]. Ballard's opposition (and deposition) are full of such claims as to his beliefs, thoughts, and feelings about what occurred while he worked for SPI, but these claims are simply not factual assertions based on Ballard's personal knowledge.

Another example: Ballard's brief discusses conversations that he had with his "former

co-plaintiff" Artiss Rogers, and that Rogers was told at a meeting with SPI officials that "SPI usually lays off older workers first"[2] [DE 18 at 3]. However, aside from not being alleged in an affidavit or another statement under oath, this is not based on Ballard's personal knowledge – it is based on inadmissible hearsay. Suffice it to say that Ballard's submissions to the Court are replete with examples of his speculating about what others may have thought. This is not evidence and will be disregarded.

## II.    Substantive Claims

With those procedural issues examined, I move on to the substance of SPI's motion for summary judgment: SPI moves for summary judgment on Ballard's claims of age discrimination, disability discrimination, hostile work environment, and retaliation.[3]

### A.    Age Discrimination Claim

The ADEA provides that it is "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To prevail on a discrimination claim under the ADEA, Ballard may

---

[2]It is unclear from the record here what Ballard means by "former co-plaintiff." The initial complaint filed in this matter [DE 1] makes no mention of Mr. Rogers, and there is no indication from the docket that Rogers was ever a plaintiff in this action. In his opposition, Ballard indicates that his former attorney also represented Rogers and that Ballard and Rogers understood that their claims would be filed jointly, but the basis for this assumption is not clear from the record [DE 18 at 2-3].

[3] SPI notes that Ballard's complaint alleges only that SPI's failure to rehire him was due to discrimination and retaliation, but that Ballard now tries to argue that his initial dismissal from SPI was also discriminatory and retaliatory [DE 16 at 1, n.1]. "A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996). Ballard's complaint only raises claims regarding SPI's failure to hire him [DE 1], and that complaint, which has not been amended, is what controls the scope of this litigation. This opinion addresses only those claims that have been properly raised by Ballard's complaint.

proceed under either the direct or indirect method of proof. *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008). Under the direct method, a plaintiff must present direct and/or circumstantial evidence that "'points directly' to a discriminatory reason for the employer's action." *Id.* Under the indirect method, a plaintiff must adhere to the burden-shifting formula set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.* at 672.

In proceeding under the direct method, Ballard must point to either direct evidence or circumstantial evidence that shows that there was a discriminatory reason for SPI's failure to rehire him, and the burden is on him to demonstrate that a genuine issue of material fact exists for trial. *See Markel v. Bd. of Regents*, 276 F.3d 906, 910 (7th Cir. 2002). Direct evidence is that which, "if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption." *Rhodes v. Illinois Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). Under the direct method, a plaintiff can also prevail by constructing a "convincing mosaic" of circumstantial evidence that "allows a jury to infer intentional discrimination by the decisionmaker." *Id.* (citing *Troupe v. May Dep't Store Co.*, 20 F.3d 734, 737 (7th Cir. 1994)).

Under the indirect method, the plaintiff must establish a *prima facie* case of discrimination, and once he does so, the employer has to articulate a legitimate, non-discriminatory reason for its employment action. *Rhodes*, 359 F.3d at 504. In response, the plaintiff then has to prove that the employer's reason is merely a pretext for discrimination. *Id.* To establish the *prima facie* case, the plaintiff has to prove that he was a member of a protected class, that he was performing his job satisfactorily, he experienced an adverse employment action, and similarly situated individuals were treated more favorably than he was. *Id.*

Here, Ballard contends that SPI discriminated against him on the basis of his age when it did not rehire him in November 2008. However, Ballard has not met his burden under either the direct or indirect method. Ballard has not explained whether he is proceeding under the direct or indirect method of proof, but he cannot succeed under either theory.

"The focus of the direct method of proof is . . . whether the evidence points directly to a discriminatory reason for the employer's action." *Atanus*, 520 F.3d at 671 (internal citations omitted). Such evidence has to "allow a jury to infer more than pretext; it must itself show that the decisionmaker acted because of the prohibited animus." *Van Antwerp v. City of Peoria*, 627 F.3d 295, 298 (7th Cir. 2010) (quoting *Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 601 (7th Cir. 2003)). Thus, absent at least a "minimal showing that the real reason" for SPI's failure to rehire Ballard was his age, his "direct claim fails." *Id.* at 299.

Here, there is absolutely no evidence in the record that would support proceeding under the direct theory. There are no admissions from SPI that they did not rehire Ballard as a result of his age. Nor is there any circumstantial evidence of suspicious timing, ambiguous statements or behavior directed at other carpenters the same age as Ballard. Nor is there evidence that younger carpenters similarly situated to Ballard received systematically better treatment than Ballard. To the contrary, the evidence is that a number of carpenters of all ages were laid off at the same time as Ballard because of a change in client demand, and that carpenters of all ages were rehired based on whether they had directly contacted SPI looking for work [DE 16-6 at ¶¶ 19-20, 34-36; DE 16-7 at ¶¶ 4, 8-9]. Prior to the November 2008 layoff, Ballard himself was laid off and rehired by SPI "several times" while he was over the age of fifty. [DE 16-2 at 4, 11-12]. In short, Ballard has presented no evidence that would allow him to proceed under the direct

method.

So this leaves Ballard to proceed under the indirect method, and that approach is similarly unsuccessful. The first question is whether Ballard has established a *prima facie* case of discrimination. *Rhodes*, 359 F.3d at 504. Ballard was over fifty in November 2008, so he is a member of the class protected by the ADEA. 29 U.S.C. §§ 623(a), 631(a). There is no evidence in the record that Ballard was not performing his job satisfactorily, and in fact SPI concedes that he was [DE 16 at 16-17]. SPI's failure to rehire Ballard was an adverse employment action. *See, e.g., McDonnell Douglas*, 411 U.S. at 796 (addressing employer's failure to rehire employee). As to whether similarly situated individuals were treated more favorably than Ballard – *i.e.,* that younger people were hired back but he was not – Ballard has provided me with no evidence one way or the other. However, SPI has established that following the November 2008 layoff, it hired or rehired sixty employees over the age of forty, and twenty of those employees were over the age of fifty [DE 16-6 at § 34]. On April 7 and 10, 2009, SPI hired thirty employees, half of whom were over forty and seven of whom were over fifty [DE 16-6 at § 36].

Even if I were to assume that some of those rehired by SPI were similarly situated to Ballard but outside of the protected class, his claim would fail. This is because SPI has proffered a legitimate, non-discriminatory reason for its employment action. *Rhodes*, 359 F.3d at 504. The fact of the matter is that SPI did not rehire Ballard because it did not know that he was available for work. Ballard has to prove that SPI's stated reason for not calling him back to work is merely a pretext for age discrimination. *Id.* Ballard argues that he "understood and still believes the only just way workers should be sent out on jobs is to go out based on the union 'out

of work' list" [DE 18 at 7]. Nonetheless, Ballard concedes in his memorandum to the court that

SPI was within its rights to call workers out directly. [DE 18 at 7-8]. Ballard admits that after

previous layoffs, he did in fact contact SPI directly, although he felt that he "mostly received

nothing more than a run around," despite the fact that in those cases, he was in fact rehired [DE

18 at 7]. Ballard maintains that by virtue of his union membership, he should not have been

required to contact SPI directly [*Id.* at 7-8]. While Ballard may believe that it is unfair for SPI to

contact carpenters directly, as opposed to going through the union to find out of work carpenters,

this does not prove pretext. In fact, the record is devoid of any evidence whatsoever to indicate

that SPI's failure to rehire Ballard was done because of his age and not because SPI simply

didn't know that he was available for work. For these reasons, Ballard's age discrimination

claim must fail.

### B.     Disability Discrimination Claim

The ADA prohibits employers from discriminating against disabled employees on the

basis of their disabilities. *Dickerson v. Bd. of Trustees of Community College Dist. No. 522*, 657

F.3d 595, 600 (7th Cir. 2011). For a plaintiff to survive summary judgment on a disability

discrimination claim, he must show that he has a disability under the ADA. *Ames v. Home

Depot U.S.A., Inc.*, 629 F.3d 665, 670 (7th Cir. 2011). A person is disabled within the meaning

of the statute if he has "a physical or mental impairment that substantially limits one or more

major life activities of such individual," a "record of such an impairment," or "being regarded as

having such an impairment." 42 U.S.C. § 12102. "Major life activities can include caring for

oneself, sleeping, walking, and working." *Ames*, 629 F.3d at 670. "A substantial limitation is a

limitation that renders an individual unable to perform a major life activity or that significantly

restricts an individual in performing a major life activity." *Id.*, citing 29 C.F.R. § 1630.2(j). Put another way, the term "substantially limited" means "the inability to perform a major life activity as compared to the average person in the general population, or a significant restriction 'as to the condition, manner, or duration' under which an individual can perform a particular activity." *Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 554 (7th Cir. 2011), citing 29 C.F.R. § 1630.2(j).

Ballard cannot show that his high frequency hearing loss is an ADA disability because there is no evidence in the record that it substantially limited his major life activities. Ballard has presented no evidence that his high frequency hearing loss substantially limited his activities at home. And Ballard's hearing loss, which is only high frequency and "has never had anything to do with [his] normal hearing function," also did not affect his ability to perform his work satisfactorily [DE 16-2 at 14, 16-17]. His hearing did not significantly restrict him from performing a range of jobs for SPI [DE 16-2 at 17]. And although he testified in his deposition that if he was wearing "excessive hearing protection," it was frustrating to him and his coworkers because he couldn't hear them [DE 16-2 at 17], this complaint does not rise to the level of *substantially* limiting his major life activity of working.

Although not raised by either party's briefing on summary judgment, I will quickly address the other two statutory definitions of "disabled:" a person having a "record of such an impairment" or "being regarded as having such an impairment." 42 U.S.C. § 12102(1)(B-C). Ballard has presented no evidence whatsoever that he has a "record" of a substantially limiting impairment, so he cannot proceed under that theory. To prevail under 42 U.S.C. § 12102(1)(B), Ballard must demonstrate that he has "a history of . . . a mental or physical impairment that

substantially limits one or more major life activities." *Kotwica v. Rose Packing Co., Inc.*, 637 F.3d 744, 748-49 (7th Cir. 2011), citing 29 C.F.R. § 1630.2(k). Ballard has presented no such evidence. Moreover, a litigant proceeding under 42 U.S.C. § 12102(1)(B) must still show that he or she "had a 'physical impairment that substantially limits one or more major life activities,'" and a failure to present evidence to that effect is fatal. *Serednyj*, 656 F.3d at 556, citing 29 C.F.R. § 1630.2(k); *see also Kotwica*, 637 F.3d at 748-49 (plaintiff's failure to present evidence that her hip problems met statutory definition of impairment entitled defendant to summary judgment). As discussed above, Ballard has presented no such evidence.

Finally, Ballard has presented no evidence that SPI regarded him as having such an impairment. "To fall within the statutory definition of a 'regarded as' claim, a plaintiff must show that: (1) the employer mistakenly believes the employee has an impairment that substantially limits a major life activity, or (2) the employer mistakenly believes the employee's actual, but nonlimiting, impairment substantially limits a major life activity." *Serednyj*, 656 F.3d at 556. In other words, the plaintiff must show that "the defendant employer believed that she suffered from a physical or mental impairment that substantially impaired her ability to work." *Kotwica*, 637 F.3d at 749. Ballard informed SPI of his high frequency hearing loss when he initially applied for work there [DE 16-2 at 4], but even taking the evidence in the light most favorable to Ballard, this is not sufficient evidence to demonstrate that SPI regarded Ballard as having a disability that substantially limited his ability to work, as required under the ADA. There is no evidence whatsoever that SPI somehow regarded Ballard's high frequency hearing loss as more limiting than it really was. To the contrary, the evidence is that Ballard's supervisor had no knowledge of his high frequency hearing loss, and did not think that Ballard was limited

in any way [DE 16-7 at ¶ 7).

In sum, there is simply no evidence from which a reasonable jury could infer that Ballard's high frequency hearing loss rendered him unable to perform any major life activities, or that significantly restricted him from performing major life activities. For these reasons, SPI is entitled to summary judgment on Ballard's ADA claim.

### C.    Harassment and Hostile Work Environment Claim

Ballard claims he was subjected to a hostile work environment because of his disability and age. To survive summary judgment on a hostile work environment claim based upon age, Ballard must show that (1) he was subjected to unwelcome harassment based upon his age, (2) the harassment was so severe or pervasive that it altered the conditions of his work environment, and (3) there is some basis for employer liability. *See Kriescher v. Fox Hills Golf Resort and Conf. Ctr.,* 384 F.3d 912, 915 (7th Cir. 2004). I note that the Seventh Circuit has "not yet decided whether a claim for hostile work environment is cognizable under the ADA." It has, however, "assumed the existence of such claims where resolution of the issue has not been necessary." *Mannie v. Potter*, 394 F.3d 977, 982 (7th Cir. 2005). In such cases, it has "assumed that the standards for proving such a claim would mirror those . . . established for claims of hostile work environment under Title VII." *Id.* For purposes of this motion for summary judgment, I too will assume that Ballard's claim for hostile work environment based on his disability is theoretically cognizable, and assess it under the same Title VII standards applicable to his hostile work environment claim based upon his age. However, in both instances, Ballard's claims fail because he cannot prove the unwelcome conduct was based upon his age or disability and that it was severe or pervasive enough to sufficiently alter his daily work environment.

To begin with, Ballard offers no evidence suggesting that he was harassed because of his age or hearing loss. To proceed to trial, the plaintiff must show that the harassment was because of the plaintiff's protected characteristics. *Vore v. Indiana Bell Tel. Co., Inc.*, 32 F.3d 1161, 1164 (7th Cir. 1994). There is no question that the horseplay and pranks going on at the BP job site would make for an unpleasant place to work. The problem for Ballard, however, is that none of the conduct about which he complains was directed at him *because of* his age or high frequency hearing loss. There is absolutely no evidence in the record that would allow a finder of fact to determine that the conduct that he endured was because of his age or hearing loss. To the contrary, he admits that *all* SPI carpenters at the BP job site endured the horseplay that he complains of, whether they were young or old, disabled or not. In other words, he has offered no evidence that the environment at SPI was "uniquely hostile" for disabled or older carpenters. *Kriescher*, 384 F.3d at 915. Rather, the evidence was that no carpenter was safe from the nonsense that permeated the BP job site, and that one was just as likely to have an air horn set off in his vehicle regardless of whether his hearing was excellent or terrible, or to have water poured in his hard hat if he was twenty or sixty. To put it another way, Title VII (or, for purposes of our analysis, the ADA) does not protect employees from "equal opportunity" harassers, bullies, or, as appropriately suited to this case, "pain[s]." *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 546 (7th Cir. 2011); *Vore*, 32 F.3d at 1164; *Holman v. Indiana*, 211 F.3d 399, 403 (7th Cir. 2000). The vast majority of the pranks and horseplay that Ballard points me to were not in any way related to his age or his hearing loss. There are however a couple of exceptions that need further discussion. For example, the noise pranks may have been especially annoying or worrisome to Ballard because of his high frequency hearing loss. Ballard asserts,

without citation, that he believes that the air horn pranks exacerbated his hearing problem [DE 18 at 5].  But once again, there is simply no evidence in the record that indicates that SPI employees were directing these pranks at Ballard *because of* his high frequency hearing loss. Rather, the air horns, according to Ballard's own testimony, were set off without regard for who may have been nearby [DE 16-2 at 5; DE 16-3 at 11, 21].  The same was true for the loud radio blasting [DE 16-4 at 5-6].  This kind of indiscriminate horseplay, while annoying for anyone, cannot be classed as discriminatory, because it is the very equal opportunity harassment that Title VII does not prevent.

As to the allegations of age discrimination, the closest that Ballard comes to establishing actionable harassment was the incident where Atterbury built him a rocking chair.  To be actionable, the alleged harassment must be "both subjectively and objectively so severe or pervasive as to alter the conditions of her employment and create an abusive working environment."  *Wyninger v. New Venture Gear, Inc*., 361 F.3d 965, 975 (7th Cir. 2004); *see also King v. Acosta Sales and Mktg., Inc.*, No. 09 C 456, slip op. at 4 (7th Cir. March 13, 2012); *Quantock v. Shared Mktg. Services, Inc*., 312 F.3d 899, 903 (7th Cir. 2002); *Ngeunjuntr v. Met. Life Ins. Co.*, 146 F.3d 464, 467 (7th Cir. 1998).  "In determining whether the environment was objectively hostile, a court must consider all of the circumstances, including the frequency and severity of conduct, whether it is threatening and/or humiliating or merely offensive, and whether the harassment unreasonably interferes with an employee's work."  *Wyninger*, 361 F.3d at 975-76.

In order for a single incident of harassment to be severe enough to be actionable, it must involve egregious behavior.  *See e.g. Lapka v. Chertoff,* 517 F.3d 974, 984 (7th Cir. 2008) ("It is

well settled that even one act of harassment will suffice if it is egregious") (internal quotation marks and citation omitted); *Hostetler v. Quality Dining, Inc*., 218 F.3d 798, 808 (7th Cir. 2000) (same); *Smith v. Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999) (district court erred in finding that sex-based harassment can never be actionable unless it is repeated).

The one-time incident at issue here – the building of a rocking chair – could be construed as an inappropriate comment on Ballard's age.  But the conduct cannot be said to be so egregious as to amount to a "severe" act of harassment.  For these reasons, SPI's Motion for Summary Judgment on Ballard's hostile work environment claim is **GRANTED**.

### D.     Retaliation Claim

Ballard claims that he was not rehired by SPI in retaliation for filing an EEOC charge and because of his hearing loss [DE 1 at ¶ 13].[4]  Title VII prohibits an employer from discriminating against an employee because he has opposed a practice that Title VII has made "an unlawful employment practice," or because he "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII.  *See* 42 U.S.C. § 2000e-3(a).  Title VII also protects employees against unlawful retaliation, which occurs when an employer takes an adverse employment action against an employee for opposing impermissible discrimination.  *Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 751 (7th Cir. 2002) (citing 42 U.S.C. § 2000e-3(a)).  It appears that Ballard is arguing that he was retaliated against under both Title VII and the ADA.  The anti-retaliation provision of the ADA, 42 U.S.C. § 12203(a), is similar to

---

[4]Ballard also alleges that SPI failed to rehire him because he filed a worker's compensation claim, in violation of public policy [DE 1 at ¶¶ 1, 14].  It appears that Ballard may be trying to allege a retaliatory discharge action under Indiana state law, known as a "Frampton" claim, *Frampton v. Central Indiana Gas Co.*, 260 Ind. 249, 297 N.E.2d 425 (1973).  Because I am granting summary judgment on Ballard's federal claims, I decline to exercise supplemental jurisdiction to decide this claim.

Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a), and so courts look to Title VII retaliation cases in deciding ADA retaliation cases. *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009).

Like discrimination, as discussed above, retaliation can be proved under either a direct or indirect method of proof. *Tomanovich v. City of Indianapolis,* 457 F.3d 656, 662-63 (7th Cir.2006). To prove retaliation under the direct method, a plaintiff must offer evidence that: (1) he engaged in a statutorily protected activity; (2) the defendant subjected him to an adverse employment action; and (3) a causal connection exists between the two events. *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 686 (7th Cir. 2008) (citing *Treadwell v. Office of Ill. Sec'y of State*, 455 F.3d 778, 781 (7th Cir. 2006)). Under the direct method, a plaintiff must produce sufficient direct or circumstantial evidence that the employer had retaliatory intent. *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). Direct evidence does not rely on inference or presumption at all, and "essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus. Needless to say, such admissions are rarely encountered." *Id.* (internal citation and quotation omitted). Circumstantial evidence under the direct method of proof is evidence that allows a jury to infer intentional discrimination by the decision-maker. *Id.*

Ballard engaged in a statutorily protected activity by filing an EEOC complaint. Ballard was subjected to an adverse employment action: SPI did not rehire him after he was laid off in November 2008. The problem, however, lies in the causal connection between the two: Ballard has presented no evidence, direct or circumstantial, that would allow a factfinder to infer retaliatory intent. Obviously, SPI did not receive notice of Ballard's EEOC complaint until after

it was filed on April 16, 2009 [DE 16-6 at ¶ 26]. SPI hired employees on April 7 and 10, 2009, prior to the filing of the EEOC complaint [DE 16-6 at ¶¶ 35-36], so those hirings could not have been causally related to the EEOC complaint. And while SPI did hire some employees *after* the hirings in April 2009 [DE 16-6 at ¶ 34], there is simply no evidence that directly shows that SPI had a retaliatory intent in not rehiring Ballard. Just because some rehiring occurred after the EEOC complaint was filed does not prove intent. This is because suspicious timing alone can almost never be enough, in the absence of other evidence of retaliation, to prove a retaliatory motive. *Tomanovich,* 457 F.3d at 665; *Pugh v. City of Attica, Indiana*, 259 F.3d 619, 628 (7th Cir. 2001). Thus, Ballard cannot prove his claim via the direct method.

Under the indirect method of proof, Ballard must show that: (1) he engaged in a statutorily protected activity; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 688 (7th Cir. 2010). "Once a plaintiff satisfies his initial burden, the burden then shifts to the defendant to present a non-invidious reason for the adverse employment action. If the defendant meets this burden, the plaintiff must then demonstrate that the defendant's proffered reason was pretextual." *Dickerson*, 657 F.3d at 602.

SPI argues that Ballard cannot make out his *prima facie* case. But the clearest route to seeing the fatal flaws in Ballard's claim is to skip directly to the question of pretext, a path of analysis that the Seventh Circuit has repeatedly held is perfectly permissible when it is case dispositive. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 885 (7th Cir. 2012); *Everroad v. Scott Truck Systems, Inc.*, 604 F.3d 471, 478 (7th Cir. 2010); *Bodenstab v. County of Cook,* 569

F.3d 651, 657 (7th Cir. 2009). SPI has articulated a non-discriminatory reason for its failure to rehire Ballard. They were simply unaware of his interest in coming back to work at SPI because Ballard made no effort to contact the company and inform them that he was looking for work [DE 16-2 at 10; DE 16-3 at 14-15; DE 16-6 at ¶¶ 29-33]. This is despite the fact that he had taken those very steps a number of times before when he was laid off. Because SPI was able to articulate a non-discriminatory reason for its failure to rehire him, the burden shifts back to Ballard to demonstrate that SPI's stated reason is phony. *See, e.g.*, *Gleason v. Mesirow Fin.*, 118 F.3d 1134, 1146 (7th Cir. 1997). But other than his own conjecture and speculation, there is no evidence for Ballard to point to that would indicate that SPI did not rehire Ballard because he participated in statutorily protected activity.

The motion for summary judgment on the retaliation claims is therefore **GRANTED.**

## CONCLUSION

For the foregoing reasons, SPI's Motion for Summary Judgment [DE 15] is **GRANTED**, and SPI's Motion to Strike Plaintiff's Sur-Reply [DE 21] is **DENIED** as moot. As stated above in footnote 4, to the extent that there are supplemental state law claims raised by the complaint, I now relinquish jurisdiction over them.

**SO ORDERED.**

ENTERED: March 27, 2012

s/ Philip P. Simon
Philip P. Simon, Judge
United States District Court
